We'll hear argument first this morning in Case 12-574, Walden v. Fiore. Mr. Buchholz. Mr. Chief Justice, and may it please the Court, in holding that the — in holding that Respondents could bring this Bivens lawsuit against Officer Anthony Walden in Nevada, the Ninth Circuit made two errors that independently require reversal. First, as to personal jurisdiction, the Ninth Circuit held that it was sufficient that Respondents have connections to Nevada and that Officer Walden allegedly targeted his conduct at them, knowing of their contacts with Nevada. That plaintiff-centered approach is inconsistent with this Court's precedents, which emphasize that the defendant himself must have meaningful contacts with the forum State. Second, as to venue, the Ninth Circuit relied on the fact that Respondents felt in Nevada the effects of Officer Walden's alleged conduct in Georgia. That similarly plaintiff-centered approach is in conflict with the text of the venue statute, 1391b2, which focuses on where the events or omissions giving rise to the claim occurred, not where the impact of those events or omissions may be felt. Do you have any preference as to which of those errors you would like us to rely on? Well, Justice Scalia, I think for the reasons set out in the Federal law enforcement officer's amicus brief, which I'll try to explain, I think that it would be preferable for the Court to address personal jurisdiction and not just venue. The reason is that venue in removed cases works differently. There really is no venue, per se, in removed cases. So if the Court only reaches venue here, holds that venue is improper, in theory and maybe there are limitations problems with this, but in theory the plaintiffs could refile the same lawsuit in State court in Nevada. It would be a Bivens lawsuit. It would arise under Federal law, so we would remove it. But then removal would mean under 1441a venue would be proper, per se, in the district of removal, because that's the way removal works. And this Court so held in Pulizzi half a century ago. And then there would be no personal jurisdiction, and then the personal jurisdiction would be under the Ninth Circuit's decision and we'd be back exactly where we are now. Scalia. Of course, the venue question does not bring into the Court a constitutional question, and the jurisdictional one does. That's true. And we usually try to avoid constitutional questions. That's true. And the avoidance canon is certainly one factor the Court could take into account in deciding which issue to reach or which issues to reach or in what order. On the other hand, the personal jurisdiction question is a constitutional question, but it's not a constitutional question in the strong sense of the term, because the only reason that the personal jurisdiction question has applied in this case is a constitutional one is because Congress hasn't provided for nationwide service of process for Bivens claims. And as the Court pointed out in OmniCapital, the Congress has the power to do that. It's not for the Court to do that on its own, to fill a perceived policy gap in personal jurisdiction law. And so even though it is a constitutional question as currently configured, if Congress thought that it were a problem to apply the existing personal jurisdiction jurisprudence to Bivens claims and wanted to provide for nationwide service of process based on the idea that what counts is contacts with the U.S. as a whole as opposed to any particular State. Ginsburg. Not likely, is it, considering that the Bivens claim was created by this Court and not Congress? I'm not suggesting that Congress should do that. I think Congress should not do that. I think Bivens claims, for the reason that Your Honor just stated, is sort of the last place that anyone should start to create a more plaintiff-friendly version of personal jurisdiction. The Court has gone to the Court. I'm sorry, Your Honor. Ginsburg. You would not have any problem about, assuming we agree with you that it's no personal jurisdiction, it's the wrong venue, for the district court in Nevada to transfer the case to the Federal district court in Georgia? Well, I think, Justice Ginsburg, in the ordinary course in a case starting in district court under Section 1631 or the venue statute, that would be an appropriate course. Here, the district court asked the Respondent specifically, if I agree with Officer Wilden on personal jurisdiction or venue, do you want me to transfer or do you want me to dismiss? Because the statute gives the district court discretion and says in the interest of justice, transfer is permissible in lieu of dismissal. The Respondent said emphatically, we don't want you to transfer. We want you to dismiss. I guess they decided they would rather have an appeal to the Ninth Circuit and take their chances with an appeal than pursue the case in Georgia. So I think under the unusual. It's probably turned out to be a good strategy, at least to the extent they got to the Ninth Circuit. Isn't Calder v. Jones in considerable tension with your proposition that you don't look to the plaintiff's contacts with the forum? I don't think so, Your Honor. I think there is definitely some language in Calder that could be read in a variety of ways. I think the key language in Calder, excuse me, is the Court states its conclusion. It says in sum, California was the focal point both of the article and of the harm suffered by the plaintiff. And then the Court later says that the defendants expressly aimed their conduct at California. It doesn't say at the plaintiff, who happened to be in California. It says at California. And I think that's not an accident that the Court used those formulations. In all of the personal jurisdiction cases before Calder and since, and for that matter decided the same day, and Keaton decided the same day as Calder, the Court has emphasized that random, attenuated and fortuitous contacts with the forum state aren't sufficient, and that in particular, contacts between the defendant and the forum that are created by the unilateral activity of the plaintiff are not sufficient.  So the Court says that the plaintiff's intent was to create a forum that was aimed at California. I think what the Court meant, Justice Alito, is that the article was distributed in California. California was by far the largest market for the National Enquirer. The article recounted events or alleged events that happened in California, and the article was drawn from California's sources. So it's not fortuitous that the effect of the article was felt in California. That was nothing about that was fortuitous, because the defendants knew that the article would be distributed widely in California, that it was the largest market, and they drew their sources. Alito, it was distributed everywhere. It was the National Enquirer, so it was probably in every supermarket in the country. And why does California, as an abstract entity, care about an article that makes allegedly defamatory statements about things that are not true? Why does California care about an article that people supposedly did in California? I don't quite understand that. Well, let me try to answer the first part of your question first, Justice Alito. It's true that the National Enquirer was national and was distributed throughout the country, but the Court went to pains in the opinion to emphasize that California was the largest market. And so when the Court said, the brunt of the harm, that this is right after the Court's reference to express aiming, where the Court said the defendants. It's for everything, isn't it? Well, I think particularly for the National Enquirer, when you're talking about articles about celebrities, about actresses in particular, that allegedly injure their professional reputation and prevent them from getting future actors jobs. I don't understand. Are you suggesting if this, everything was the same except Ms. Jones was in New York, there would be a different result in that case? No, I'm not suggesting that. I think that. Well, I thought several times you said California was the biggest market. Right. But I think the way that Calder reads, I think that there are a number of factors. One of them is plaintiff's residence in California, that that's where she was when she suffered the emotional distress from reading the article about herself and where her job prospects were allegedly adversely affected. But it's also true, the Court points out, that not only is — when the Court says the defendants expressly aimed their conduct at California, the next passage after that, where the Court explains what express aiming at California means, says California was not only where Ms. Jones suffered the brunt of the harm, but where the defendants knew that the Inquirer had its largest circulation. So I don't think you can disentangle the fact that that's where she was, which of course was a relevant factor in that case because it was true, from the fact that the defendants in a broader sense, in a more, in a sense not based on her unilateral activity, but in a sense based on their own context, aimed at California. Well, what does it mean in the context of an intentional tort, which is what we're talking about here, to aim at a particular State, if it doesn't mean to aim at a person who you know to be within that State? I mean, nobody conducts an intentional tort intending to injure California per se. You're intending to injure a person who resides in California. So what would it actually mean to aim conduct at a State irrespective of a person? Well, Justice Kagan, I think the answer is that it could take a few forms, and it depends on the type of case. And it would be very difficult to try to come up with a single, you know, sort of comprehensive unitary answer to that question that would govern all types of cases. I think the way that the plurality put it in Jay McIntyre for intentional tort cases is that maybe you're intending to obstruct the laws of the forum State. That would be more meaningfully aimed at the forum State qua State and not just somebody who happens to be in it or have a connection to it. Another way that conduct could be aimed at a State would be if it's a species of purposeful availment or purposeful direction, where you're projecting your conduct into that State, whether that's physical and literal or whether it's through some indirect or technological means, for some benefit, for some reason, where you're projecting your conduct into that State, not just because that's where the plaintiff happens to be, which is incidental and irrelevant to you, that the plaintiff is there as opposed to anywhere else, but because you're seeking that State out. That could be — it could be, in a case like Jay McIntyre, the Court, of course, divided over whether, in a very broad sense, sending your product into the stream of commerce, intending that it, in some sense, you know, go to the U.S. as a whole without any particular focus on a given State was sufficient, but at least there, at least there, you have the intent to serve the U.S. market as a whole. And so you at least are on notice that your own conduct is putting you at risk of being held into court in any one of the States. Kagan, I mean, I guess I just — the McIntyre example is a very different kind of example, because in those cases you really are talking about a company seeking to serve a general market in a State. But intentional tort cases don't usually have that quality. You're going after a particular person in an intentional tort case, and it's odd to think of going after an intentional — a particular person, whether it's a defamation suit or it's a fraud suit or what have you. And so I think that's a very different kind of thing as — as targeting the State itself. Well, I think if it's a defamation suit, Justice Kagan, if you project your defamation into the forum State, then it's fair to say that you've, in a sense, entered the forum State, whether that's electronic or physical, as in Calder. But in this case, it was known or should have been known that these were gamblers. They were in Nevada. That's where a lot of — that's where their gambling takes place. They were residents of Nevada. So in that sense, they were like the plaintiff in Calder. The injury was there, and the defendant arguably knew or should have known that that's where its major impact would be. I recognize your point that when you take money away, then you're inconvenienced in any State where you happen to be. But there was an argument here, or it seems to me there is an argument here, that this was gambling. And these people were from Nevada, and so this curtails their right or their option to conduct their activities in Nevada. Well, Justice Kennedy, the complaint alleges that the plaintiffs had contacts with Nevada, were residents of Nevada. Of course, they showed Officer Weldon California licenses. That's what the complaint alleges, not Nevada licenses. And so at the time of their actual — But didn't they say they were residents in both places, in both California and Nevada? They do say that. But there's no reason to think, and even they don't allege this, that Officer Weldon knew that at the time that he actually interacted with them. And so there's no allegation that he's — Let me ask this, and it's probably clear in the reason. Is the gravamen of the complaint the seizure at the airport or the later false affidavit? Because to the extent it's the later false affidavit, that cuts against you marginally. Well, I would emphasize marginally, Justice Kennedy, because I think the gravamen of the complaint is both. I don't think there's a way to separate them. The effect that the plaintiffs are — the reason for their lawsuit, their claim damages based on the allegedly false affidavit, is that it took them longer than it otherwise would have to get their money back. It's the same money that was seized in Atlanta. So it's a continuation of the effect of the seizure. You can't separate them cleanly. And the affidavit — Would your answer be different? Suppose that the officer had said, you can keep — you can keep your money. Go on to Nevada with it. And then, once Fiori's had reached Nevada, the officer said — the officer filed a false affidavit, which, let's say, froze the Fiori's bank accounts. Would your — would your answer be different? The affidavit was filed in Georgia, but the money was not seized in Georgia. Instead, the money has gone on to Nevada. Is there personal jurisdiction in Nevada? Justice Kagan, I think if — if what Officer Weldon allegedly had done — of course, that's not this case — is freeze a bank account in Nevada, then — Well, he did it by filing an affidavit in Georgia, and then it froze a bank account. No, I understand the — I understand the question. But if what he had done is freeze a bank account in Nevada, then maybe it would be fair to say that he had entered into Nevada by freezing the bank account in Nevada. But here, the cash was in Atlanta. The plaintiffs brought the cash to Atlanta. Officer Weldon didn't seek them out knowing that they had any connection to Nevada. He didn't go to Nevada. He didn't direct anyone in Nevada to do anything. He didn't seize or freeze a bank account in Nevada or direct anyone to do anything like that. He never had any contact with Nevada at all, except for the very intangible contact, if you can call it that, of allegedly writing this affidavit to keep the plaintiffs from getting the money back sooner than they would have. But the plaintiffs would have gotten the money back wherever they happened to be, or really, more precisely, wherever their lawyer happened to be. The fact that they chose a lawyer in Nevada and that's where they asked the government to send them their money back ultimately is the very definition of fortuitous contact between Walden and Nevada. Sotomayor, you started by saying that our personal jurisdiction and venue provisions and jurisprudence center on a plaintiff's action, not on the plaintiff's action or injury. Calder suggests otherwise. But how do you respond not only to, Justice — I'll do this after, but let me just pose the question and you can answer it on your rebuttal. I'm worried about the Internet thefts from somebody's account in Vermont by someone in Illinois's, the hypothetical on page 19, who steals something from a store in California. Thank you, Justice Sotomayor. If I may, I'll reserve the balance of my time and, as you suggested, address that on rebuttal. Thank you. Roberts. Thank you, counsel. Ms. Sherry. Mr. Chief Justice, and may it please the Court. If I could start with this Court's decision in Calder, because the facts of this case stand in stark contrast to Calder. In Calder, the article was all about the State of California. It was about the California activities of a California resident whose career was centered in California, based on California sources, and in a magazine that it's — where its primary publication was in California. Here, even if you were to focus just on the affidavit, the affidavit is in every real sense focused on the State of Georgia. According to Respondent's own allegation, it recounts what happened in the Atlanta airport in Georgia. It was based on information that was received by Officer Walden in Georgia. It's about funds that were seized in Georgia, that remained in Georgia. It was repaired in Georgia, forwarded to an AUSA in Georgia for forfeiture proceedings in Georgia. And so the two cases could not be more different. Just as the focal point of the tortious activity in Calder was on the State of California, here the focus of the tortious activity was on the State of Georgia. Scalia. Did the affidavit ever get to Nevada? It didn't get to Nevada. Based on Respondent's own allegations, it was sent to an AUSA in Georgia for forfeiture proceedings in Georgia. And notably, had Respondents wanted to regain their property during the 6-month period of seizure, they would have had to go to Georgia to do so. Do we know how much of the information, the supplemental information that was prepared in Nevada and then was forwarded to Georgia, how much of that information was in the affidavit? Based on the current record, I don't know that we do. If you look at the complaint allegations, they suggest that the exculpatory – what they call the exculpatory information was left out of the affidavit. The affidavit itself, if it even exists, is not in the record in this case. And then, you know, by focusing – you asked the question, Your Honor, about what the gravamen of this case is. I think in a very real way, the gravamen of the case is the initial seizure. The Ninth Circuit focused exclusively on the affidavit and Respondents do so here as well, but I think it's a quintessential example of the tail wagging the dog. The affidavit is at best a thin and artificial read. Even if you were to focus exclusively on the affidavit, as I explained in the case of the 9th Circuit. Ginsburg, it was stated as a separate claim, and I think Judge Berzon read it that way, and I don't think Petitioner has taken issue with that. That there's – one claim is for the seizure, another claim is for the false affidavit. So the seizure stops the funds immediately, and then the false affidavit keeps them there. So I didn't think there was a genuine difference between the parties on whether the affidavit, knowingly composing a false affidavit, is an independent claim. There isn't for purposes of this case in this Court, and I don't mean to suggest otherwise. But while there may be a distinct claim, there is no distinct injury. The injury that Respondents allege based on the affidavit is simply that the initial seizure continued beyond the time that it otherwise would have, and for that reason the harm, the same economic harm that they were already feeling in Nevada, continued beyond a certain point in time. Kagan. But imagine a case where everybody agreed that the initial seizure was lawful, so that that wasn't part of the complaint at all, and the only complaint was that a false affidavit had been filed, so that after making a preliminary investigation, the officer hadn't transferred the money, but had instead kept it. And, again, obviously that's not this case, but I don't think that case would be any different, because assuming that the affidavit looks the same as it's alleged to look in this case, it would still be focused at money in Georgia and everything about it would still be related to Georgia. Again, the only connection to Nevada would be the fact that Respondents felt some harm in that State. It's not a harm that's unique in any respect to Nevada. It's a harm that they would have felt no matter where they traveled, if they had gone to their other residence in California, if they had left on another. And that would be true even if the Respondents had never been in Georgia? No, I think it's significant here that the Respondents did go to Georgia. I mean, here we are talking about a traveling plaintiff, a mobile plaintiff, who voluntarily left their home State and traveled to other States, traveled to New Jersey, traveled to San Juan, and traveled to Walden's home State, the place where he lives and works, and brought their cash with them there. And so I think it is significant that they did travel to the State of Georgia, and I think it shows how broad the Ninth Circuit ruling really is. As far as law enforcement officers go, Federal, State, or local, this is a really problematic decision, because they interact with travelers from all 50 States and beyond on a daily basis. The idea that based on those interactions that they can be hauled into a faraway and distant forum based on nothing more than their interaction with a traveler and finding out where that person is from, which of course, unlike this case, the driver's licenses that were showed were not from the State of Nevada. In most cases, when travelers show a driver's license, it's from their State of residence. Alito, do you think it's relevant in a case like this whether the Federal officer who was sued is represented by the Justice Department? I don't think it's relevant at all. I would point, Your Honor, to the Court's decision in Stafford v. Briggs. In that case, it's a venue case. It's about 1391e. In that case, the dissent made an argument that that provision should extend to personal capacity cases against government officials. And one of the arguments made is there's really not much of a burden on them because they have DOJ representation, because they have indemnification. And the majority there rejected that argument. I think it's equally implausible here. And I think it's significant that not only did the Ninth Circuit rely on the fact that DOJ representation, which, mind you, is not a guarantee, it's a discretionary determination, but not only did they rely on it, they relied on it to say that there would be personal jurisdiction here because this is a Federal official or really a State official deputized as a Federal official. Ms. Sherry, just to try to figure out how far your argument goes, suppose there's an IRS agent sitting in Washington, D.C., and she maliciously does something, files an affidavit, does whatever she does, to impose a tax penalty on somebody in Nevada. And everything that she does happens in Washington, D.C. Does the person in Nevada who is the victim of this malicious attempt to impose a tax penalty have to go to Washington, D.C. to sue her? I think there's more difficult questions there where the individual hasn't left the State at all and where it's targeted at the State. I think that comes to Your Honor's question about what it means to sue. Well, she's a very mobile person. She lives in Nevada, but she goes other places.  Isn't that what you said? So why should she be able to bring suit in Nevada, under your view? That is what I said, and I think maybe it goes to Your Honor's other question earlier about what it means to expressly aim your conduct at the forum State as opposed to just the forum resident when we're talking about an intentional tort. And the cases that have looked at this, they have looked for something more besides simply aiming your conduct at a forum resident, some indication that the defendant is trying to reach into the forum State. And some of the examples that have come up is when they've actually sent something into the forum State, whether it's a defamatory article or a letter, the bullet example that's in the restatement and mentioned in the briefs, in those cases, the defendant is actually sending something physically into the State or, for example, directing activity in the forum State, directing something to happen in the forum State. Whatever the answer is to that hypothetical, the facts here are really quite different. Walden didn't do anything to reach into the State of Nevada. And as my colleague pointed out, the only connection to Nevada and the idea that the money was going to be returned there and eventually was returned there is entirely fortuitous. It's based entirely on the unilateral acts of the plaintiff, the fact that they happened to hire a Las Vegas attorney. Scalia Ms. Sherry, would you want us to decide this case on the jurisdictional question or the venue question? Sherry The Court I think can do either. My preference would be the same as Petitioner's, that the Court decided on personal jurisdiction grounds and the reasons are the ones expressed in the Federal Law Enforcement Officer Brief. Roberts What type of action would the United States have brought if they decided to bring an action? It would have been in personam or in rem against the assets? Sherry It would have been an in rem action against the assets. It would have been a forfeiture complaint that would have been filed in Georgia. And in those proceedings, the Respondents would have had an opportunity to contest the forfeiture. If during either the pendency of those proceedings or even before those proceedings, if they had wanted to seek to regain control of their property, they would have had to file a motion or a petition in the State of Georgia. They wouldn't have been able to file one in their home State. And again, those are the statutes that we cite at page 31 of our brief. The consequence of the Ninth Circuit's decision here really is to allow personal jurisdiction as well as venue to travel with a mobile plaintiff in a way that it cannot travel with mobile chattel. We've talked mostly about personal jurisdiction here. If I could just take a quick moment on venue and point the Court to this, to the Leroy decision in 1979, nobody contests that there would be no venue in the District of Nevada under the Leroy decision. The language change in 1990 does nothing to change that. It does nothing to change the result. And Leroy Respondents avoid the statutory text, and I think it resolves this case. Thank you. Roberts. Thank you, counsel. Mr. Goldstein. Mr. Chief Justice, may it please the Court. You are being asked by the other side to write an opinion about personal jurisdiction that is going to try and slice the salami very, very, very thin, that is going to create a huge amount of confusion about these facts versus the facts in Calder, and that is going to be very, very difficult to reconcile with the Internet cases and the cases that the lower courts are constantly confronting about where a person in State A intentionally injures a person in State B. And that person frequently doesn't shoot a gun into the other State. They sit at their computer and they steal money out of the bank account. They take the person's ID. They use their credit cards and the like. I think, in truth, the way the case is most likely to be resolved is that the person in State B is the one who is injured. Scalia, we disagree, and so let me focus on your point and Justice Kennedy's  The claim here, the complaint states two complaints, Judge Berzon recognized. One is about the seizure. It's exactly what you're describing. The other is about the false affidavit. And those really are different as a matter of law. I have a couple of citations to give you to explain how this legal process works. What happens is the DEA seizes the money at the Atlanta Hartsfield Airport. He takes the cash and he turns it into a locker. Then what happens is that we have to state a claim to the money. And when we state a claim to the money, they either have to do one of two things. They have to give it back to us as a matter of law, or they have to start a forfeiture process as a matter of law. And if you start the forfeiture process, you have to provide to the assistant U.S. attorney a factual basis for the forfeiture. And the way to look at this, I think, is the way that Justice Kagan's hypothetical asked, and that is imagine that there were two officers here, not one. Officer A, we'll call him Walden, is at the Atlanta Hartsfield Airport and he seizes our money. And just assume that that's perfectly lawful. We then state a claim to the money and then we provide factual information about why it is that the money is not subject to seizure. They have to return it to us at that point, or they have to start the forfeiture process. And when that second officer creates a false affidavit to start the forfeiture process, we're not in Georgia, we have no ongoing contacts with Georgia, and we are losing access to the money only in Nevada. That's the only place we're in. Alitoson Suppose that the plaintiffs in this case were not professional gamblers. Let's say they were major league umpires or they are members of a rock group that's going on a tour of 25 cities. Where would there be personal jurisdiction there? In every place where the umpire was going to appear at a game, every place where the group was going to perform? No, sir. The lower courts have tackled this question because people go visit their mother-in-law, they do travel around, it's a mobile society, and they have taken from your opinion in Calder and Jones the focus on where it is that the plaintiff lives and works. And there's a good reason for that. Personal jurisdiction is trying to tackle the question of where does the defendant reasonably believe that he will be hailed into court. It's a fairness principle, and that is we need to have a predictable rule that allows the would-be defendants to know, okay, if I do this. Alitoson Well, here the plaintiffs apparently lived in two places, right, California and Nevada. Suppose my hypothetical rock performer has five houses, one in California, one in Montana, and so forth. Is that a personal jurisdiction everywhere? No, sir. And let me just start with the premise of this case, all right. My friend said that this officer was shown a California driver's license. That's not correct. He wasn't shown a California driver's license. The officer in San Juan, Puerto Rico was shown one. They only — their principal residence, the complaint alleges I think in paragraph 2, is in Nevada. We do have situations, and that's where they lived and worked. We have situations. Alitoson Well, they were sufficiently residents of California to get California driver's licenses, were they not? That is true. At one point, and they had moved. I'm going to step outside the record just so I can accurately answer your question. But it will give you a sense of how these cases actually operate. Most often, you have the situation where they're college students. You know, you have a college student who lives at home with their parents, but they go off to college, and they may be injured where it is that they live and go to school in that case. And what the lower courts do is sensibly, they say, if you know where the person's principal residence is, and this case is simplified by the fact that the district court understood and assumed that the defendant knew that they lived in Nevada, it's never been contested in the case, and Judge Berzon said, quite correctly, what you have to do is you have to make it a prima facie case, because there's no evidence in this case, that the principal residence was Nevada and that the defendant knew that. Scalia You're really arguing for a very broad principle. Whenever there is an intentional tort, you can be hailed into court at the place of residence of the person against whom the tort is committed. Alitoson No, sorry. I'm sorry. That's what I thought you were saying. And I've misled you, and let me state our test, which I haven't done yet, and that may help you. Our rule is as follows. When the defendant intentionally targets the plaintiff for injury in State A where the injury arises, and that's going to be the big difference, does the injury arise there? Justice Scalia, your impression in your earlier question was that this injury didn't arise in Nevada, but our test requires that it arise in Nevada, and the defendant knows that it's going to arise in Nevada. I'll contrast our false seizure claim, right? We were in the airport. We lose the $97,000. If we then go back to Nevada and then file suit, our injury can't travel with us. And that's the big concern of the court. Breyer I don't see how it arises in Nevada. What they're saying is that some people in Georgia didn't give back some money that they took in Georgia. To take your example, my question is this. You say there are many, many, many cases to get this all mixed up if we don't follow your rule. All I want you to do is cite me a few. But the few that I want you to cite me will meet certain criteria. For example, a college student goes into the bookstore, and it's also a pharmacy, by the way, and he breaks his finger in the door, which he thinks is faulty. He says, I'm going home. Send me some bandages. The store never does. Send me some books. I just bought them. The store never does. They know his home address. All right. Injury. Now, what about those? Cite me some lower cases where they say there's jurisdiction in cases like that. I have not seen any. Oh, I lost my billfold. I lost it here in the store. When you find it, will you send it back? They never send it back, but they found it. All right. So just give me some lower court cases that finds jurisdiction in that kind of situation. In that kind of situation where the injury actually – and you've named several situations. No, no. The injury, my goodness, he lost his billfold. There was money in it. And by the way, when he gets home, his parents are away, and he's not going to have any money to spend on food or even, like, CDs or anything. So, Justice Breyer, it is our position that in that situation there is not personal jurisdiction, and let me try to – There's no jurisdiction in those cases where he lost his billfold in the bookstore in the college town, a thousand miles away from home, and he's going home, and everybody knows he's never going to have any money, and they keep the money. Okay. What's the difference? If there's no cases on those, what is the difference between that case and your case? Okay. The difference is that the defendant in that instance, the injury arises at the bookstore. Okay? And the fact that it has a continuing effect as a practical matter, the lower courts uniformly treat the injury arising as in the bookstore. But there are situations that you can imagine the following, and that is he loses the billfold in the store. Okay? That injury arose there. Now, someone takes the credit card from the billfold after he's gone home, knows that he's at home, and starts spending his money with it. That injury arises where he lives. Okay. Now, give me the case that says that. Okay. The cases that are closest to that, two of them are at page 25a of the Petition Appendix. They are the Bancroft case and that – these are not going to be billfold cases. Okay?  These are bigger cases than that. And it's the Petition Appendix. You're allowed – you've pulled open the red brief, so I'm asking you for the cert petition. The Bancroft case at 25a is where a Georgia resident writes to a Virginia registrar, and the registrar misappropriates the website of a California company. And that is they never set foot in California. They don't, you know, do anything in California at all. And there, there's jurisdiction in California because they know that the person is going to be hurt in California. The next one is Metropolitan Life. That is same page. An Alabama resident writes to an insurance company, and they say, ah, I'm entitled to the insurance proceeds, but the actual proceeds belong to someone in California, and they never get the money. So it's like this case. The money never gets sent into California. And these remote injury cases, and there's a case. Breyer. Is this a case like – I'll look at those cases.  But is your case a case like where the credit card is used, somebody finds it in the country, and they're spending the money, and did the agents here who were outside Nevada, and they were keeping the money, were they going and spending it? They weren't going and spending it. Was there a credit card that they were using? No, sir. I'm giving – I was trying to take a billfold example, and I'm trying to figure out just which cases I should read carefully, and I will read those carefully. Okay. And there's a case that's discussed in several of the briefs called Dudnikov, and that involves an eBay – an eBay-like auction, and someone in one State blocks an auction in another State. So let – one of the impressions that – But was the money here in Georgia the whole time? The money here – Was it still there in that locker? No. Here's the thing about it. This is no longer about the cash. This – the actual answer to your question is he turns the money in at a locker. Okay? Then it's deposited into an account. It's not about the physical money in any way, shape or form at that point. We weren't – when we got the money, nobody sent us a duffel bag full of cash. There was a check, of course. Well, if it were about the – Yes. So suppose they seized a gold watch. Okay. And then they refused to return the gold watch. Yes. But the gold watch really is still sitting there in Georgia. Yes. Okay? Would you say that then there's personal jurisdiction in Nevada? Okay. And same facts, and that is a false affidavit. It's not just they seized it, it's they make a false affidavit. They seize it, and then there's a false affidavit keeping it. Yes. And the complaint is only about the false affidavit, but it's in reference to property that is indisputably in Georgia. Yes. I do think, if you can prove an injury, which I think is very hard from the gold watch, let's say a computer, just to make it a little bit more plausible that they would be heard in Nevada, then, yes, I do think if you can make out an injury, which isn't – the tort doesn't arise until the injury occurs. That's why the lower courts treat these cases as the tort occurring where the victim is. Mr. Goldstein, can I take you back to the origins of all of this? Yes. The main rule for personal jurisdiction traditionally is the plaintiff must go to where the defendant is, no matter how inconvenient that is for the plaintiff. Jurisdiction is defendant-centered. You're trying to hold a defendant. You have to go where he is. Then the long-arm age comes about, and we have specific jurisdiction. Which, by the way, is what you're urging. Yes. You're certainly not saying they have all-purpose jurisdiction over Walden. Correct. And this Court, as McIntyre's decision indicates, has been pretty careful about specific jurisdiction. I mean, there wasn't enough that the machine blew up or cut somebody's fingers in New Jersey. They had to purposely avail themselves of whatever the standard words are. And here you're asking for really pushing this specific jurisdiction to the limit. The defendant has acted only in Georgia. He hasn't set foot outside this State. Okay. So I don't think we are trying to push the bounds. Let me make one point about McIntyre and then try and create the misimpression that I think that's been left, that there are few contacts between Nevada in this case, and hopefully prove to you that there are far more contacts between this tort and this forum than will be true in the overwhelming majority of cases that the lower courts confront. And the point I would make, Justice Ginsburg, and it's made by the plurality in McIntyre, is that there have always been special rules for intentional tort cases. That's the distinction, and that's why Calder comes out the way it does, citing Restatement Section 32nd of the Second Conflict of Laws. And that is the reason, it's not just made up, the reason there's a special rule for intentional torts is that the defendant knows he's hurting someone somewhere else and therefore expects to be hailed into court. The view of the McIntyre plurality, of course, was that the overseas manufacturer there wasn't itself doing anything directed at the forum. But if I could just get to the very important point about my question. Alito, if I could just move on from that point. Your argument is dependent on the fact that the officer here knew that the plaintiffs were residents of Nevada, is that right? That they lived and worked there. Why should that make any difference? The conduct is the same, the injury is the same. What if he didn't know? Then there would be no personal jurisdiction. That is actually generally what the lower courts hold, and their reason is that the defendant is doing something knowing that he may be hailed into that court. It is a defendant-favoring rule that intends to give predictability. Now, if that's wrong, it doesn't hurt my case, because as the case comes to you, it's not going to be wrong. Scalia, you could say that about whatever rule we adopt. Once we adopt the rule, when the defendant will know that if he violates that rule, he's going to be hailed into court. Justice Scalia, there is a circumstance. It's sort of a self-fulfilling point. It's almost like the Fourth Amendment reasonable expectations of privacy. There is a circularity here, but it's not entirely circular, because we're talking about a specific State here. It's not that he knows that the plaintiffs might live in Georgia or might live anywhere in the United States. It's a very specific State, and that's why it's not circular. Now, if I could just help you understand our view that there are a lot more contacts between this Court and Nevada than in the great, great, at least 90 percent of the cases the lower courts are confronting. So here are the points that I would make about those contacts, and there are six, and I will try and be brief. The case involves money in vote in own by Nevada residents, $30,000 of which originated in Nevada and all of which was on its way to Nevada. Second, the defendant intentionally hurt the plaintiffs, knowing that they would lose access to the money in Nevada where they lived and work. Third, we will use documents in Nevada to prove that his action was intentional because it omitted the information that the defendant requested. This is not us unilaterally sending money. At the Atlanta airport, he said, send us the proof that the funds are legitimate, that he requested and received from the plaintiffs in Nevada, and that he learned in searching a Nevada law enforcement database, which is paragraph 79 of the complaint. The two last points I would make is that the plaintiffs will show that they were deprived of the money in Nevada until the Nevada lawyer they had to hire used records in Nevada to persuade the government to send the money to Nevada. And the plaintiffs in their case, of course, will show, because it is the fact that they are gamblers working in Las Vegas, that the economic injury occurred to them there. Now, if you think that's not enough, if you conclude that's not enough, you are closing the door absolutely to all of the Internet cases, because those are cases where someone sits at the computer and targets someone in another State. This is a different world, but this is a ‑‑ the facts here are old-fashioned. Everything that happened here could have happened in 1920. Yes. Could have happened in the 19th century. Yes. So I don't see what the Internet has to do with this. Justice Alito, you always tell us that you've got to write a legal rule, and there is no special personal jurisdiction rule, and the lower courts recognize that. Yes, well, there seems to be, because it's hard to think of an Internet case where a defendant wouldn't be having communications with people in the foreign State, wouldn't be inviting business, wouldn't be doing all kinds of things. So there are many kinds of Internet cases, but I don't automatically see in deciding this that we are deciding any of them. Justice Breyer, the kinds of Internet cases, and it's wrong for me to just say Internet, the kinds of cases that I'm talking about are the fraud cases, the intentional tort cases. Like what? You steal ‑‑ you're sitting in Georgia, you don't. But someone is sitting in Georgia, and they steal the identity of someone who's in the foreign State. I wouldn't do that. I'm ‑‑ exactly right. That's why I took it immediately back, recognizing the error. He wouldn't know how. But there are bad people in the world, obviously, and those people do, with increasing and distressing frequency, with these new tools of communication, they are very, very capable of causing significant harm to someone else without actually setting foot in the State. Now, I have to offer you a solution. Let me just be clear. I recognize that this can go either way. Because if I say Internet cases, well, then I'm opening the door to potentially a very wide range of cases going into Nevada. And we have here the special case of a law enforcement officer. And I believe that I do have the solution. And that is, this is actually a case about transfer. It is not a case about jurisdiction and venue. This is the unusual case where the defendant filed a motion to dismiss and did not file a 1404 motion to transfer. And this case is a lot ‑‑ you should treat it like Atlantic Marine. Because what you need to do is recognize, I think, that there is the big category of jurisdiction. Where there is jurisdiction, there is a subset, there is venue. That's where you can file a lawsuit. That is not where the case is going to be litigated. And in these cases, what defendants uniformly do, and the lower courts pay incredible attention to the fact that law enforcement officers are going to be witnesses or are the defendant. In these cases, the defendant comes in and says, okay, I recognize technically there is jurisdiction and venue. But let me tell you how disruptive it will be if I actually have to litigate the case. Alito. Well, I don't understand what you're saying. You're saying that we should reverse the Ninth Circuit's dismissal and send it back for the district court to consider whether the case should be transferred? No, sir. I would not ‑‑ this is my judgment. I do not want it reversed. But I'm saying ‑‑ I didn't know that. So that's why I'm confused by what you're saying about transfer. I'm trying to describe an opinion that you would write. And the opinion that I think you would write is this and says, look, personal jurisdiction in the wake of Calder, particularly where there are contacts here, exists. Venue exists because several of these are events and omissions, including the injury that occurs in Nevada. But what we expect the lower courts to do in a case like this is to pay particular attention at the beginning of the case, as we do with qualified immunity, to have an efficient process in which the defendant can say it would be ‑‑ But you're asking the court to decide a big‑ticket item, personal jurisdiction. And what the theory that you're proposing would apply not to just to Officer Walden, but it would be about as far out as any specific jurisdiction case I know. So the court shouldn't say, well, jurisdiction, okay, venue, okay, but consider transferring it to Georgia. That seems to me wild. Justice Ginsburg, I am not trying to just skip over. I've talked for this entire time about why I think we're right on jurisdiction and venue, and I'm pleased to return to the issue. What I'm suggesting to you is that I recognize that we can't have ‑‑ there are two ways of dealing with the prospect of a broad personal jurisdiction rule. One is to narrow it substantially. The second is to recognize that it doesn't determine where the case is going to ultimately be litigated. I will tell you, Justice Ginsburg, from personally reviewing all of the post‑calder cases in the Federal courts and the State courts, that the contacts here are much, much greater between Nevada and this tort than exists in the great majority of cases that the lower courts are confronting. And so if you believe ‑‑ Ginsburg. Did Kwanda have something to do with the notion that every defamation is a ‑‑ that every publication is a tort where it occurs. There is something special about the libel cases. There was that theory that wherever the paper that contains the libel article, wherever it's sent, each one of those places, the tort occurs there. Two things about that. That is the rule for torts, not specifically ‑‑ it does ‑‑ it's true of libel, but it's true as well of fraud. The fraud occurs where the person is defrauded. This is straight from the restatement. It's the ordinary common law rule. So the tort does happen where the victim is injured, in libel and in a case like this. Scalia, you're libeled wherever it's published. You don't have to be there where it's published. You are libeled wherever it's published. And, Justice ‑‑ that's correct. And, Justice Scalia, this is exactly why. You are asking the question, why is it that then‑Justice Rehnquist's opinion in Calder has the discussion that the other side is focusing on about how the article was centered on California and how it came from California sources? Now, none of the holding of the case describes it, but you wondered, and he has emphasized, my friend has, why is it in the opinion? And it's for the reason you've just given, and that is defamation and libel cases. When you're talking about the publication to the Internet or publication nationwide like the National Enquirer, the lower courts have rightly focused on the fact, can we say that this isn't just directed to the United States? Scalia, but wait, wait. You could say that Calder, far from being an expansive decision, was a narrowing decision. It said, you know, there's jurisdiction not necessarily everywhere where the libel was published, which is where the injury occurs, but there's jurisdiction only in California where these other connections exist. We're saying the same thing. I'm just not explaining my view of it well enough. And that is the — Scalia, except it's harder for you to establish that the injury occurred in Nevada. I don't think so. And let me try my best. All right? The reason these defamation cases about Internet and national publication — say the New York Times is sued for defamation. The Court was very concerned and the lower courts are concerned that the publisher can't be sued in all 50 States. And so what the lower courts have done in the wake of Calder is say, I know you published it to the whole country, National Enquirer, but is it fair to say that you expected to be held into court in California because there were special features about this defamation? Now, defamation and nationwide publication is very different from the other torts the lower courts confront, which was suggested in the first 30 minutes of questioning, I think, by Justice Kagan, are directed at a person. The shoot-the-gun example, the defraud, the victim. Scalia, our jurisdiction cases have not been based on where you expected to be sued. You could expect to be sued anywhere if the State says you're going to be sued here. Our cases have focused on whether the State has jurisdiction, whether the State has enough connection with it to assert its power. Not the expectation of the defendant, but the power of the State. What's going on here? Justice Scalia, I agree with you, but I will say in my defense that when the Court has said, when we're trying to figure out if there are minimum contacts and whether it's consistent with fair play and substantial justice, the language the Court has used is, is it fair because the defendant could reasonably be expect to be hailed into the court. That's true of purposeful availment cases like McIntyre. It's true of intentional court cases. And that is, we measure fairness and whether you're getting process that is due to you procedurally by whether this is something that you could expect to happen to you, that you've done something. Scalia, that's your new test, just whether you could expect this to happen. No, sir. No, sir. I've given you a specific test about where you have to intentionally injure the person knowing that they will be injured there and the injury has to arise there. And as I've said, the way in intentional tort cases that has to work is that the lower courts recognize that a tort has a wrong and an injury, and the injury is what makes the tort complete and the tort occurs where the victim is. Just take the shoot the gun example, right? The reason is that the person is injured there. It doesn't have to be that you shoot the gun, that the bullet travels across the State line, because the same thing can happen when money is taken out of your bank account. What is the – what are the elements of the second tort? Yes. It is essentially a fraud claim. What is the element? That he knowingly submitted information that caused the government not to send us the money. No.  Right. Yes. That is, we – there's no evidence. How do I find that? Because, you see, in the fraud case, the element includes the victims being misled. Yes. That's not necessarily true here. I wonder this. No. It's actually not the case that the victim has to be misled in fraud, Justice Breyer. So, for example, if you have to be a misrepresentation. Yes. A knowing misrepresentation. Material to. Yes. Material to. Here to the government's decision. Not here, but material to normally. It has to be material to the obtaining, say, of property. Right. Or the refusal to return. Now, where do I find the elements of the tort that you're alleging here? The tort that we are alleging here is essentially common law fraud under Bivens. I can give you citations. I don't see anything in the complaint that says anything like that. It just says, where do I look to see it? Okay. The citations to the complaint about – would be paragraphs 99 to 101. It's alleged to violate the Fourth Amendment and our due process rights to have submitted the false affidavit that caused the government not to send us the money. And if you were to conclude, Justice Scalia, that this injury doesn't arise here, let me just tell you what the consequences of that are. And that is, there are a large number of cases that arise constantly where people lose access to money, where they don't have the insurance proceeds sent to them, or the Social Security checks, or the IRS refund. Kagan. And Mr. Goldstein, as I understood what Mr. Buchholz was saying, he was saying there's a distinction between an officer who commits a fraud in Georgia when your money is in Nevada, and so he commits a fraud and he freezes your bank account in Nevada, versus he commits a fraud by filing this affidavit, but it's as to money that is located where he is, not where you are, but where he is in Georgia. That's the distinction I understood him to be drawing. What do you think about that? It doesn't make any practical sense to me, and the money wasn't in Georgia. The money was in an account in Quantico, Virginia that belonged to the DEA. What difference does it make, as a matter of personal jurisdiction, between the following two cases, and that is, the defendant sitting in Georgia steals money from my bank account in Nevada, or the defendant sitting in Georgia causes the government not to send me the money. Because the element, one of the elements of the crime in the second case, no element of the crime or no element of the tort, it's only the injury, which isn't an element of the actual underlying behavior that gives rise to, and in the first case, it's the other. There's an element that takes place there. That's what I'm looking for. I'm looking for that. I'm not saying I have it. But that's why I asked you the question I did and was then. I believe that the elements of the tort that Justice Kagan is describing are the same elements that I'm talking about here. It's just where the money starts. Roberts. What if the plaintiffs in this case didn't leave Georgia? Yes. They said, look, I'm not leaving until I get my money back. Right. And I'm going to get my money back as soon as the lawyer sends us the receipts or whatever it is. Yes. Is that a different case? It is a different case, Mr. Chief Justice. And the lower courts say the real question is where is this a kind of injury that will arise where the plaintiff lives and works? And any case that could cause that. I thought your arguments were basically it does arise where he lives and works because it's in Nevada. And he still lives and works in Nevada, even if he stays in Georgia and says, I'm not leaving until I get the money. No. That is, for example, on our seizure claim, we acknowledge that at the very least there wouldn't be venue. And there's another difference in addition to the fact that they had returned to Nevada and they had returned to living and working, and that is in our actual case, we have the documents that are sent at his request from Nevada. We have the fact that he searches the Nevada law enforcement databases. And we have the fact that the money is going to be sent by the government to Nevada. It's requested by their Nevada lawyer, sending documents from Nevada. And so those are, if we think of Calder as a case in which there's not merely injury in California, but a few extra factors that were in California, that's much more this case than it is any of the other cases that the lower courts are confronting. I would just discourage the Court, if I could. Ginsburg. Except, Mr. Colston, it is of no consequence to Walden whether this person is from Alaska, Nevada. In Calder, the article was about a person in California. The sources came from California. The paper had its principal circulation in California. It seems to me there's nothing resembling that in this case. Justice Ginsburg, to my mind, what resembles it are the documents that go from Nevada to the defendant, and we think that's specific to the fact that it was a libel and defamation case. Thank you. Thank you, counsel. Mr. Buckell, you have four minutes remaining. There was a lot of talk about intentional torts being different and how there should be a different rule on intentional torts. And I want to start just by emphasizing the implications of that. The other side is putting all their eggs in the basket of what's in Officer Walden's mind, triggering some different personal jurisdiction inquiry. And my friend even referred to qualified immunity by analogy, but I think that analogy is very important and it shows why it would be unworkable to make personal jurisdiction turn on what's allegedly in the defendant's mind. This Court initially created qualified immunity on that model, as it's based on subjective good faith. That turned out not to work, because subjective good faith. Sotomayor, write a holding that takes care of your case without putting at risk the Internet cases that he's talking about. Justice Sotomayor, I think there's absolutely no reason the Court needs to address Internet cases or any other cases involving modern technology. This case is the most modern technology involved in this case, I think, is a dog sniff at the airport. There's just no reason for the Court to address any of those issues. Counsel, your adversary is right. We write rules that get applied to different contexts. Right. So write the holding for me that can't be just defendant's activities, because Calder did more than just defendant's activities. So write a different, write the holding. Of course, Justice Sotomayor, I understand there has to be a rule. And the rule is here there's tangible property. This isn't a case about property with no real world presence that only exists on a server somewhere. This is a case about cash. It was in a bag. And the bag was in Atlanta, on the plaintiff's persons, in Atlanta. It was seized in Atlanta. And the only effect there'd be a difference if the bag had been shipped to Washington, D.C. And, you know, money is fungible. Money is everywhere and nowhere. So it seems as though money is a bit different from a gold watch. The, the, it's only contingent that the money remained in Atlanta rather than being shipped to a bank someplace else. Well, I think it's not contingent. I mean, from Officer Weldon's perspective, I think it's incidental and contingent that the plaintiffs happened to be from Nevada, and that's where the effects of the seizure or the continued seizure or the delay in return were felt. But I think, to try to answer, Justice Sotomayor, your question and your question earlier about freezing a bank account and other kind of electronic cases or Internet cases where different technologies are involved, maybe there's a difference between freezing a bank account in Nevada. Maybe that can be said to be something that occurs in Nevada that's reaching into a bank and has a real effect in Nevada to cause something to happen in Nevada, which is different from seizing cash in Atlanta, knowing and failing to return it, knowing that the failure to return it is going to have an impact wherever the plaintiffs are, which presumably will include where they live, which is Nevada and California. So maybe there's a way to draw a line between freezing a bank account in Nevada, or in Bancroft and Masters and Dudnikov, the cases that my friend relied on, there were real-world activities happening in the forum state. In Dudnikov, there were goods, there were, there were fabric prints that existed in the real world, and they were being, they were in Colorado, and they were to be sold in Colorado. Kennedy, could this record or these complaints be read to support the conclusion that the injury was substantially altered by the false affidavit based on the misuse of the information received from Nevada? Well, Justice Kennedy, I think the complaint, again, we're not challenging the reading by the lower courts that there's a claim based on the affidavit that's distinct from the claim based on the seizure. On the other hand, the complaint only has a Fourth Amendment claim in it. That's the only source of law that the complaint relies on. And the Fourth Amendment injury was complete upon the seizure, upon the search and seizure which occurred in Atlanta. The quantum of damages wasn't known yet at that time, because the plaintiffs didn't know whether they'd get the money back or when or what might happen in between. But that Fourth Amendment injury occurred then and there. And so the fact that maybe their consequential damages are higher because they didn't have the use of the money for longer as opposed to shorter, I suppose that could increase their damages, but it doesn't fundamentally change the nature of this case as one that has no meaningful connection between Officer Walden's conduct, all of which occurred in Atlanta and in Nevada. You say the affidavit wouldn't give rise to a Fourth Amendment claim. I think Judge Acuda made that point below, Justice Scalia, and I would agree with that. That, however, is what the complaint alleges, and we're here on personal jurisdiction and venue and not on the merits of the complaint. So, again, the complaint alleges that there's this affidavit. May I finish, Mr. Chief Justice? You can finish your sentence. The complaint alleges that there is this affidavit written in Georgia for the purpose of seizing funds that were seized in Georgia that were to be forfeited in Georgia. The only connection to Nevada is the fact that the plaintiffs allegedly felt the impact there. Under any of this Court's precedents, that's not sufficient. Thank you, Your Honor. Thank you, counsel. Counsel. The case is submitted.